Argued and submitted January 21, affirmed March 23, petition for review denied
July 19, 1994 (319 Or 406)

THE COMMUNICATIONS GROUP, INC.,
and James Keeling,
*Appellants,*

*and*

Karen DICK
and Quality Connection Sales and Installation, Ltd.,
*Plaintiffs,*

*v.*

GTE MOBILNET OF OREGON,
an Oregon limited partnership,
and GTE Mobilnet, Inc.,
*Respondents,*

*and*

Nada PERRIE,
Suesan Weeks, Sandra West, Mark Ripley,
William Porto and Edward Ragan,
*Defendants.*

(9012-08136; CA A75184)

871 P2d 502

Mark E. Griffin argued the cause for appellants. With him on the briefs was Griffin & McCandlish.

Jeffrey M. Batchelor argued the cause for respondents. With him on the brief were George L. Kirklin, Richard C. Hunt and Lane Powell Spears Lubersky.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

LEESON, J.

## LEESON, J.

Plaintiffs James Keeling and The Communications Group, Inc. (TCG) appeal from an adverse judgment on all of their claims.[1] We write only to address their claim for deceit, on which the trial court granted defendants'[2] motion for judgment notwithstanding the verdict. ORCP 63. We review the record in the light most favorable to plaintiffs to determine whether there is any evidence from which a reasonable jury could find each element of their claim, *Tran v. Tehrani*, 99 Or App 141, 781 P2d 393 (1989), *mod* 101 Or App 216, 789 P2d 702, *rev den* 310 Or 243 (1990), and affirm.

At the relevant times, Keeling owned and operated TCG, a business that sold cellular telephone service. In September, 1988, Keeling, as a representative of TCG, entered a two-year "agent agreement" to sell cellular telephone service as the agent of defendant GTE Mobilnet of Oregon (GTE Oregon), a limited partnership. As an agent, plaintiffs sold on behalf of GTE Oregon for a commission. In late 1989, Keeling decided that he wanted to be a "reseller," rather than an agent. A reseller buys blocks of cellular telephone "air time," and sells them on its own behalf.

In November or December, 1989, Keeling raised the subject of becoming a reseller in a conversation with Kelly, the general manager for the Pacific region of defendant GTE Mobilnet, Inc. (GTE), based in Hayward, California.[3] Kelly said that he and other GTE representatives in Hayward would formulate a contract and send it to Keeling.

On December 14, 1989, Keeling sent Kelly a letter asking Kelly to "expedite the information needed to become a reseller." Keeling also made several telephone calls to Kelly complaining that he had not yet received a reseller contract. Kelly told Keeling that applicable reseller rates had not yet

---

[1] Other plaintiffs were involved below, but their claims are not a part of this appeal.

[2] "Defendants" refers to GTE Mobilnet of Oregon, and GTE Mobilnet, Inc. Other defendants were also joined in plaintiffs' complaint, but the claims against them are not a part of this appeal. Some of the defendants raised counterclaims, which are also not a part of this appeal.

[3] GTE and GTE Oregon are distinct business entities. The parties, however, do not distinguish plaintiffs' claims against the two. Accordingly, we treat them together.

been established, but that GTE would send a contract to Keeling by July 20, 1990. A representative of GTE Oregon also sent Keeling a letter, dated June 17, 1990, stating:

"We are in the midst of reshaping our retail pricing. Wholesale pricing is dependent on the retail environment. I will provide you an updated reseller agreement when our price change is complete. However, if you would like to look at an agreement without pricing let me know and we can arrange for you to review an agreement. I expect to be able to provide you the full package, with pricing[,] by July 20."

At about the same time that Keeling first expressed his interest in obtaining a reseller contract, he and TCG became involved in litigation with one of their competitors, McCaw Cellular Communications, Inc. (McCaw). McCaw filed an action in which it alleged that Keeling and TCG had unlawfully appropriated its confidential customer list, which included the names of 20 or 30 of McCaw's employees. The list contained several misspellings. The McCaw employees whose names were on the list had received solicitations from Keeling in June and August, 1989, that contained the same misspellings found on McCaw's list. The circuit court issued an order restraining plaintiffs from "continued misappropriation and use of" the list, followed by a preliminary injunction.

Thereafter, Interstate Mobilephone Company (IMC) was substituted for McCaw as plaintiff in the ongoing litigation concerning the customer list. IMC requested production of documents calculated to show how Keeling and TCG acquired the names that were used in the June and August, 1989, mailings. Keeling and TCG refused. IMC then moved for an order compelling production of the documents. On May 2, 1990, the court granted that motion. Keeling and TCG refused to comply with the order, on the ground that IMC's request for production would divulge GTE Oregon's mailing lists, and that they were prohibited under the agent agreement with GTE Oregon from disclosing those lists. As a sanction for defying its discovery order, the court struck the answer and entered a default order. On July 3, 1990, the court entered a default judgment against Keeling and TCG for $213,000. On July 13, 1990, IMC began garnishing all of Keeling's and TCG's commissions from GTE Oregon.

On July 19, 1990, the day before GTE's self-imposed deadline for offering plaintiffs a reseller contract, GTE wrote to Keeling, saying that it had

> "concluded that a reseller agreement with [TCG] is not appropriate. Therefore, we will not be forwarding a draft agreement to you as previously indicated."

Plaintiffs filed claims against defendants, including a claim for deceit based on defendants' refusal to offer a reseller contract, as they previously represented they would do. Although plaintiffs do not specify the representations on which they rely, the allegedly fraudulent misrepresentations appear to be Kelly's statements to Keeling that defendants would formulate a contract and send it to plaintiffs, and the letter of June 17, 1990. Defendants moved for directed verdict at the close of plaintiffs' case-in-chief, and again at the close of all the evidence, on the ground that, among other things, there was insufficient evidence of a false representation. The trial court decided to submit the claim to the jury, but stated that it would entertain a motion for judgment notwithstanding the verdict if the jury found for plaintiffs. See ORCP 63B. The jury returned a special verdict, finding that defendants had "committ[ed] fraud * * *, resulting in damages to plaintiffs." It awarded $0 in general damages, and $25,000 in punitive damages. Defendants made no timely objection to the form of that verdict.

Defendants then moved for judgment notwithstanding the verdict. The trial court granted the motion on the ground that the evidence was insufficient, and, alternatively, that the jury verdict improperly awarded plaintiff punitive damages without awarding any actual damages. Plaintiffs assign error to that ruling.

■       To recover for deceit, plaintiffs have the burden of proving that: (1) defendants made a false representation; (2) they made it with the knowledge or belief that it was false, or with an insufficient basis for asserting that it was true; (3) they made the representation with the intent that plaintiffs would rely on it; (4) plaintiffs justifiably relied on it; and (5) they suffered consequent damages. *Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 405, 737 P2d 59

126

(1987). The proof of each element must be clear and convincing. 303 Or at 407.

■    Because the alleged misrepresentations are promises to do something in the future, plaintiffs must prove that defendants either intended not to perform when they made the promises, or that they made the promise with reckless disregard for whether they could perform. *Sproul v. Fossi*, 274 Or 749, 752, 548 P2d 970 (1976); *Lawrence v. Underwood*, 81 Or App 533, 537, 726 P2d 1189 (1986). There is no contention that defendants were unable to perform. Plaintiffs contend only that defendants never intended to perform the promise to offer a reseller contract.

■ ■    A fraudulent intent not to perform may not be inferred from the mere fact of the eventual failure to perform. *Jones v. Northside Ford Truck Sales*, 276 Or 685, 691, 556 P2d 117 (1976); *Tran v. Tehrani, supra*, 99 Or App at 144-45. Other circumstances of a substantial character must be shown in addition to nonperformance, to support the inference that the promisor never intended to perform. *Conzelmann v. N.W.P. & D. Prod. Co.*, 190 Or 332, 352, 225 P2d 757 (1950); *Tran v. Tehrani, supra*. In this case, therefore, plaintiffs must show that there is evidence in the record, beyond the mere fact of nonperformance, from which a reasonable juror could find that, at the time defendants made their representations, they did not intend to honor them.

Defendants maintain that there is no evidence that they did not intend to offer plaintiffs a reseller contract at the time the representations were made. They contend that all of the evidence suggests that they were working on the contract, but that shortly before their self-imposed deadline for completing it, IMC obtained a $213,000 judgment against plaintiffs, and began garnishing all of plaintiffs' commissions. Those events persuaded defendants that it would be unwise to offer plaintiffs a reseller contract.

Plaintiffs argue that "overwhelming" circumstantial evidence supports the inference that defendants never intended to carry out their promise. It is far from clear, and plaintiffs do not elaborate, how the evidence that they direct us to proves that defendants did not intend to perform their promises when they made them. The evidence that plaintiffs

rely on to show that defendants' representations were fraudulent is the same evidence that they rely on to show the existence of those representations.

For example, plaintiffs direct us to Keeling's testimony describing his conversations with Kelly about entering into a reseller contract. Keeling testified that Kelly promised to get together with GTE's representatives in Hayward and formulate a contract for him, and that Kelly substantially reiterated that promise during a number of telephone calls. That testimony is evidence of the representations themselves. It is not evidence that the representations were fraudulent.

The same thing can be said of the letter of June 17, 1990, quoted above, to which plaintiffs also direct us. The letter arguably contains a representation that a contract would be offered after defendants completed repricing. It does not support the inference that that, or any other, representation was made fraudulently. It is also noteworthy that plaintiffs have not shown how defendants stood to benefit from the alleged fraud. As the court stated in *Conzelmann v. N.W.P. & D. Prod. Co., supra*, 190 Or at 353, "[o]rdinarily, persons indulging in fraudulent conduct do so with a purpose in mind to gain some benefit for themselves."

We are unaware of any evidence, and plaintiffs have directed us to none, from which a reasonable trier of fact could conclude that defendants promised to offer plaintiffs a contract, but never intended to perform the promise. The trial court correctly concluded that there was no evidence of fraudulent intent, and, therefore, did not err by granting defendants' motion for judgment notwithstanding the verdict.

In the light of this disposition, we need not address defendants' cross-assignments of error.

Affirmed.